IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * CRIMINAL NO. |
| v. | * |
| | * |
| XAVIER FERNANDO MONROY, | * |
| | * |
| Defendant. | * |
| | ******* |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Sean Clayton, being duly sworn, depose and state that the source of your affiant's information and the grounds for his belief are as follows:

1. I am a Special Agent of the United States Defense Criminal Investigative Service ("DCIS"), which is part of the Office of the Inspector General for the U.S. Department of Defense ("DoD") and have been so employed since January 2016. I previously served as a Special Agent with the United States Army Criminal Investigation Command ("Army CID") for 22 years.

2. While serving as a Special Agent for DCIS and Army CID over the past 26 years, I have been charged with investigating acts of suspected DoD contract fraud involving complex bribery schemes, public corruption, and product substitution that violate the integrity of the DoD acquisition system. I make this affidavit in support of a criminal complaint charging XAVIER FERNANDO MONROY ("MONROY") with the offenses of Conspiracy to violate Title 18, United States Code, Sections 201(b)(2), in violation of Title 18, United States Code, Section 371; Bribery, in violation of Title 18, United States Code, Sections 201(b)(2) and 2; False Statements, in violation of Title 18, United States Code, Sections 1001(a)(2) and 2; and Obstruction of Justice, in violation of Title 18, United States Code, Sections 1505 and 2.

1

3. As part of this investigation, the investigative team, including the Naval Criminal Investigative Service ("NCIS") and DCIS, has taken several steps, including, among other things, interviewing MONROY; interviewing co-conspirators James Russell Driver III[1] ("Driver") and Sung Yol "David" Kim[2] ("Kim"), who admitted their roles in the scheme; interviewing current and former U.S. Navy employees and other witnesses; reviewing subpoena and search warrant returns, including emails sent to or from an account belonging to MONROY; and reviewing U.S. Navy records and other materials, including a U.S. Navy email account belonging to MONROY.

4. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents. Because this affidavit is limited in purpose, I am not including all facts known to law enforcement concerning this investigation. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrant sought herein. In addition, where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

## PROBABLE CAUSE

### I. Relevant Individuals and Entities

5. From in or about August 2006 until in or about August 2014, MONROY was a civilian U.S. federal employee with the U.S. Navy's Military Sealift Command ("MSC") who

---

[1] On December 18, 2018, Driver was indicted for conspiracy, 18 U.S.C. § 371, bribery, 18 U.S.C. § 201, and honest services fraud, 18 U.S.C. §§ 1343, 1346, in the Eastern District of Michigan (18-cr-20825). He pleaded guilty to conspiracy pursuant to a plea agreement on March 6, 2019.

[2] On January 17, 2019, Kim was indicted for conspiracy, 18 U.S.C. § 371, and bribery, 18 U.S.C. § 201, in the Eastern District of Michigan (19-cr-20032). He pleaded guilty to conspiracy pursuant to a plea agreement on May 1, 2020.

served as the Director of Operations at the MSC Office in Busan, Republic of Korea ("ROK"). MSC is the agency of the U.S. Navy that controls the U.S. Navy's replenishment and military transport ships. In his Operations role, MONROY was responsible for coordinating all aspects of MSC ships' arrival, logistics support, and departure from port.

6. As an MSC employee, MONROY was a "public official" within the definition of Title 18, United States Code, Section 201(a)(1).

7. Kim, a citizen of ROK, was the owner and Chief Executive Officer of DK Marine, a ROK-based husbanding services provider ("HSP") that provided items and services for U.S. Navy vessels when they arrived in port. Items and services coordinated, scheduled, and/or procured by DK Marine included fuel, food, and other supplies, trash collection, transportation, security, tugboats, and other logistical services.

8. Driver was a civilian MSC employee who served as the captain/master of the USNS Charles Drew ("Drew"), a U.S. Navy cargo ship operating in the Pacific region.

9. As described below, the evidence indicates that MONROY engaged in a conspiracy to commit bribery, and solicited, accepted and agreed to accept bribes, while serving as a U.S. Navy official. This evidence includes Kim's sworn statements admitting that he engaged in a conspiracy to commit bribery with MONROY; Driver's statements; documentary evidence, including emails in which MONROY sent confidential U.S. Navy information to Kim; and other evidence corroborating Kim's statement that he provided things of value to MONROY.

## II. The Conspiracy to Commit Bribery

10. In order for a U.S. Navy ship to acquire goods and services, internal paperwork known as a logistics requisition ("LOGREQ") needed to be transmitted from the vessel to certain administrative offices, including through the appropriate contracting process with the U.S. Navy's

Fleet Logistics Center in Yokosuka, Japan. Fleet Logistics Centers were previously known as Fleet and Industrial Supply Centers ("FISCs").

11. On or about October 4, 2013, Company 1, another ROK-based HSP company, was awarded the U.S. Navy's HSP regional contract covering countries including ROK. According to relevant procedures, as the regional contract holder, Company 1 was therefore the default HSP for port visits in ROK.

12. From in or around November 2013 until in or around December 2013, MONROY, Driver, and Kim conspired to circumvent U.S. Navy procedures to steer business to DK Marine in connection with the Drew's late December 2013 port visit in Chinhae, ROK. MONROY and Driver acted in violation of their official and lawful duties by using their positions and influence with the U.S. Navy to advocate for and advance the interests of DK Marine and Kim, in exchange for things of value provided by Kim.

13. Kim has debriefed with NCIS and DCIS agents as part of his cooperation. During his interview, Kim confirmed that he provided things of value to MONROY in order to facilitate receiving MSC business from MONROY over a number of years. According to Kim, on at least ten occasions during the course of the conspiracy, Kim and MONROY went together to "room salons," where the services of prostitutes could be hired. MONROY requested that Kim pay for "seconds," *i.e.*, prostitution services, and Kim complied. Kim also provided over $30,000 in "loans" to MONROY, all but one of which were not repaid, and paid for airplane tickets and hotel rooms for MONROY during personal travel that they took together.

14. Driver has also debriefed with NCIS and DCIS agents as part of his cooperation. Driver confirmed that he requested that Kim seek MONROY's directions on how to circumvent

appropriate Navy procedures to steer the Drew's port visit to DK Marine. Kim conveyed MONROY's directions to Driver via email to Driver's personal email account.

15. On or about February 28, 2011, Kim emailed MONROY at his personal email account, addressing him as "Big brother": "I guess it's time for us to do what we've been prepared for all of this time. Thank you! I couldn't have done this far without you. I won't forget! . . . We have a strong team to cover all areas! Let's make some real money now bro!"

16. In or about July 2011, MONROY, Kim, and Kim's wife vacationed together in Thailand. Kim paid for MONROY's travel expenses, including airfare and hotel, in connection with the trip.

17. On or about December 17, 2011, MONROY forwarded to Kim a confidential internal U.S. Navy email chain regarding a project for dredging and repair of Pier 8 in Busan. MONROY was not permitted, as an employee of the U.S. Navy, to send such information to Kim, a contractor.

18. On or about January 6, 2012, MONROY forwarded to Kim a confidential internal U.S. Navy email chain regarding port visit logistics for the Freedom Banner 2012 training exercise in Gwangyang Port. MONROY was not permitted, as an employee of the U.S. Navy, to send such information to Kim, a contractor.

19. On or about January 20–21, 2012, MONROY forwarded to Kim two confidential internal U.S. Navy email chains regarding the port visit schedule for the HSV Westpac Express for an upcoming port visit. On March 8, 2012, MONROY forwarded another confidential internal U.S. Navy email chain regarding the revised schedule for the HSV Westpac Express. MONROY was not permitted, as an employee of the U.S. Navy, to send such information to Kim, a contractor.

20. On or about February 9, 2012, MONROY forwarded a confidential internal U.S. Navy email chain regarding the port contract logistics for the Freedom Banner exercise. MONROY was not permitted, as an employee of the U.S. Navy, to send such information to Kim, a contractor.

21. On or about September 23, 2013, Kim emailed MONROY at his personal email account, stating "Happy late B day bro" and forwarding an airline confirmation for MONROY, Kim, and Kim's wife to travel roundtrip to the Philippines in October.

22. Between in or about November 2013 and December 2013, MONROY repeatedly provided directions via telephone to Kim, which Kim conveyed to Driver via email, on how Driver should circumvent normal LOGREQ procedures for the Drew's late December port visit.

23. On or about November 10, 2013, Kim emailed Driver at his personal email account requesting that Driver send the LOGREQ to MONROY: "[p]lease send the X mas LQ card at the last minute to X[avier]. So that he can deliver the support."

24. On or about November 10, 2013, in response to an email from Driver sending a competitor HSP's account statement, Kim directed: "Thanks. When submitting log reg. Do no Cc fisc. Only X and your other msc reps. You know what I mean. Then X will handle the rest."

25. On or about November 25, 2013, Kim emailed Driver at his personal email account: "Just quick reminder, please send the packet 3 days prior to your arrival and everything will be handled accordingly."

26. On or about November 25, 2013, Driver emailed Kim stating: "Copy. However, may get 'egged' to submit earlier … the minimum requirement is 10 days … will likely be somewhere between 14 and 15 as 17 would be too close to go unnoticed. Would like to know X

take on this if you can find out" (ellipses in original). Minutes later, Kim replied via email: "He want u to send in as late as possible."

27. On or about December 13, 2013, Kim emailed Driver at his personal email account: "Everything is on track here. After long talk and thinking with XYZ [. It's best that ur son [sic] send the package to my company and Cc XYZ. Plz send the package in on the 19th or 20th and will have everything already ready for you." Kim and Driver confirmed that "XYZ" referred to MONROY.

28. On or about December 13, 2013, Kim emailed Driver at his personal email account: "Important note. Don't send the package to other friends. Just to my company and XYZ."

29. On or about December 21, 2013, MONROY, Kim, and a representative of Company 1 met the Drew when it arrived in port at Chinhae, ROK. Over the objections of the Company 1 representative, Driver chose to have Kim and DK Marine provide husbanding services for the Drew's visit, with MONROY's acquiescence.

30. On or about December 21, 2013, Driver, using his U.S. Navy email account, emailed MONROY at his U.S. Navy account and other Navy employees about the Chinhae HSP situation. In the email, Driver claimed that he "was unaware of any formal HSP contract agreements with [Company 1] . . . and understood [DK Marine] would be the HSP here at Chinhae." Driver falsely claimed in the email that a shipboard communications outage had prevented the timely transmission of the LOGREQ, and when he realized the problem, on or about December 20, Driver inadvertently called KIM instead of MONROY and proceeded to make HSP arrangements with Kim because "this was an emergent issue."

### III. The Investigation and July 29, 2019 Interview

31. NCIS and DCIS are federal agencies within the executive branch of the Government of the United States. NCIS and DCIS conduct criminal investigations of matters related to Department of Defense programs and operations, including procurement fraud and public corruption. In or about October 2014, NCIS began an official investigation into possible violations of U.S. criminal laws. In or about November 2014, DCIS opened an official investigation into possible violations of U.S. criminal laws and coordinated with NCIS (collectively, the "Investigation"). As part of the Investigation, Special Agents with NCIS and DCIS are investigating, among other things, whether MONROY, while a federal employee, had received bribes from Kim and had conspired with Kim and Driver to steer business to DK Marine. The Investigation is a "pending proceeding" within the meaning of Title 18, United States Code, Section 1505.

32. On or about July 29, 2019, at the NCIS office at Pier 8, Busan, ROK, MONROY was interviewed by NCIS and DCIS Special Agents, including your affiant, in connection with the Investigation. The Special Agents identified themselves and their agency affiliations to MONROY in requesting that he appear for a voluntary interview in connection with the Investigation. During the interview, the Special Agents questioned MONROY about, among other things, his relationship with Kim and whether Kim had provided MONROY with things of value while MONROY was a federal employee.

33. During the interview, on or about July 29, 2019, MONROY knowingly and willfully made materially false statements and representations to the Special Agents concerning his relationship with Kim while MONROY was a federal employee. In particular, MONROY falsely denied:

8

    a. having a personal — i.e. a non-professional — relationship with Kim;

    b. receiving "anything" from Kim, including specifically denying receiving airline tickets, hotel stays, or loans; and

    c. steering business to a particular HSP company.

34. MONROY's false statements were material to the ongoing investigation, as NCIS and DCIS were actively seeking information pertaining to, among other things, the relationship between MONROY and Kim, bribes paid by Kim to MONROY, and MONROY's steering of business to Kim and DK Marine. The answers to these questions had direct bearing on the Investigation and whether to bring charges against MONROY or others.

## CONCLUSION

35. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that from at least in or about 2011 until in or about 2014, MONROY knowingly and willfully engaged in a conspiracy to commit bribery in violation of Title 18, United States Code, Section 371, and bribery in violation of Title 18, United States Code, Sections 201 and 2; and on or about July 29, 2019, MONROY knowingly and willingly made materially false, fictitious, and fraudulent statements and representations, in violation Title 18, United States Code, Sections 1001 and 2; and did knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law in a proceeding that he knew was then pending before a department or agency of the United States, in violation of Title 18, United States Code, Sections 1505 and 2. Therefore, a warrant should issue for his arrest.

*Sean McCl[signature]*

Sean Clayton, Special Agent
Defense Criminal Investigative Service

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 on the 20th day of May 2020.

_____
Honorable G. Michael Harvey
UNITED STATES MAGISTRATE JUDGE